## CIRCUIT COURT OF THE CITY OF RICHMOND

Mitsubishi Motor Sales
of America, Inc.

v.

Richard D. Holcomb,
Commissioner, Department
of Motor Vehicles,
Commonwealth of Virginia

September 26, 2003

Case No. HQ-1376-1

BY JUDGE MELVIN R. HUGHES, JR.

This case is before the court on an appeal of a decision by the Commissioner of the Virginia Department of Motor Vehicles (DMV) in an administrative proceeding. The Commissioner found that Mitsubishi Motor Sales of America (MMSA) failed to show good cause in terminating a franchise agreement with West Broad Mitsubishi (WBM), a car dealership in Richmond. In so finding, the Commissioner, applying Va. Code §§ 46.2-1569 and 46.2-1573(D), considered evidence that WBM added another line of cars from another manufacturer, Hyundai, to be sold and serviced from the same facility it used under its Mitsubishi franchise. MMSA argues that the Commissioner erred as a matter of law and that its due process rights to a fair

and impartial hearing under the Federal Constitution were violated. The Commissioner and DMV assert that this court, sitting as an appellate court, may only consider whether there is substantial evidence in the record to support the Commissioner's findings. On this standard of review, they contend, the Commissioner's ruling must be upheld.

An issue before the Commissioner was whether MMSA and WBM agreed that WBM would devote its sales and service exclusively to Mitsubishi vehicles. In its decision to terminate WBM, MMSA acted on three grounds: (1) WBM's failure to maintain all the conditions and requirements of the Dealer Development Plan, including exclusive facility management and capital requirements, (2) WBM's failure to obtain prior written approval of MMSA before offering the Hyundai line from the same premises, and (3) WBM's failure to maintain the minimum dealer facility requirements upon the addition of the Hyundai line.

The Commissioner found that WBM was not required to devote its dealer operations exclusively to MMSA because the parties only provided for exclusivity as a recommendation. However, the Commissioner found that WBM breached the contract by failing to obtain MMSA's written approval before changing its use of the dealership. Despite this breach, upon considering the factors under Va. Code § 46.2-1573(D), the Commissioner ruled that MMSA failed to show good cause for the termination of the WBM franchise.

On MMSA's motion, over the objection of the Commissioner and WBM, the court permitted MMSA to present evidence in support of the constitutional claims. Separate briefing and argument schedules were allowed firstly on the constitutional issues and then on the non-constitutional issues. The evidence on the constitutional questions consisted of audio tapes and transcripts of meetings of the Virginia Motor Vehicle Board.

### The Statutory Framework

Under various Virginia Code sections, the General Assembly has shown an intent to regulate the affairs of automobile dealers and manufacturers. Under Va. Code § 46.2-1569(2), it is unlawful for a manufacturer to coerce any dealer into an agreement or engage in any unfair act threatening cancellation of a franchise. Under Va. Code § 46.2-1569(5), a manufacturer is prohibited from terminating a franchise "without good cause" and without a sixty-day written notice. This section also provides that a dealer may appeal to the Commissioner for a hearing within the sixty-day period for a determination of good cause. In determining whether good cause exists, the General

Assembly has directed the Commissioner to consider eight factors. Va. Code § 46.2-1573(D).

While Virginia law directs the Commissioner to decide franchise termination disputes between motor vehicle dealers and manufacturers, it also directs the Commissioner to serve as Chairman of the Virginia Motor Vehicle Dealer Board. Va. Code § 46.2-1503(C). In a Board Mission Statement made as part of an annual reporting requirement to the General Assembly in 1989 and 2000, the Board states that its charge is to promote the interests of dealers. Due to his position as Chairman of the Board and as adjudicator of franchise disputes, MMSA contends that an irreconcilable conflict of interest exists.

When ruling in WBM's favor, the Commissioner reversed a decision of a hearing officer appointed to take evidence and render a decision on the issue of good cause. MMSA contends that, in light of the hearing officer's ruling, the Commissioner's decision is irrational, only explainable by his conflicting roles.

### The Evidence from the Dealer Board

MMSA pursued a Virginia Freedom of Information Act request and obtained written summaries, notes, and audio tapes of Dealer Board and Dealer Board Committee meetings. The court listened to the audio tapes at a hearing with counsel. MMSA contends that the Commissioner is inclined to take a pro-dealer approach, as shown by his comments during meetings. At a March 2000 Franchise Law Committee meeting, the Committee discussed proposed legislation in the United States Senate. At the urging of the Virginia Automobile Dealer's Association (VADA), the Commissioner testified in support of the legislation. At that meeting, the Commissioner stated: "And Rick, I recognize most of the people here, I hope we're, I hope everyone, I hope we're amongst friends here."

At that same meeting, on the question of a resolution to commend the efforts of the VADA and its staff, the Commissioner said: "Mr. Chairman, despite all my, the great things I've just said about this, Rick has suggested that I probably should abstain since I'm the final arbiter on disputes between manufacturers and dealers, that maybe I think that's probably good advice from my attorney, so please list me as abstaining, reluctantly." In other tapes, MMSA cited excerpts supporting its contention that the Commissioner has demonstrated that he is disposed to rule in favor of dealers.

## Standard of Review

As mentioned, the parties disagree on the applicable standard of review. The issue is whether the court's review of the Commissioner's decision is a legal issue or should be determined on the basis of substantial evidence.

"With regard to an agency's decision on legal issues, the standard of review to be applied on appeal depends upon the nature of the legal issues involved." *Volkswagen, Inc. v. Quillian*, 39 Va. App. 35, 50 (2002) (citations omitted). " 'If the issue falls outside the area generally entrusted to the agency and is one in which the courts have special competence, i.e. the common law or constitutional law' the court need not defer to the agency's interpretation." *Chippenham & Johnston-Willis Hospitals, Inc. v. Peterson*, 36 Va. App. 469, 475 (2001) (quoting *Johnston-Willis, Ltd. v. Kenley*, 6 Va. App. 231, 243-44 (1988) (quoting *Hi-Craft Clothing Co. v. N.L.R.B.*, 660 F.2d 910, 914-15 (3d Cir. 1981))). In *Browning-Ferris Industries v. Residents Involved in Saving the Environment, Inc.*, 254 Va. 278 (1997), the court ruled that on reviewing questions of law, the principles of presumption of official regularity and accounting for the experience and specialized competence of an administrative agency in reviewing agency appeals do not apply. *Id.* at 284. Where the question involves the specialized competence of the agency, the agency's determination may only be reversed upon a showing that the action was arbitrary or capricious.

The question typically reserved for judicial review of an agency decision is one of substantial evidence. The term refers to such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Under this standard, the court may reject the agency's findings only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion. *Kenley v. Waterway Estates, Ltd.*, 3 Va. App. 50 (1986).

MMSA urges that the issues on review should be determined as a matter of law in light of the Commissioner's findings and in light of the constitutional claims raised. The Commissioner and WBM urge that the test is one of substantial evidence. The court finds that the determination is on both and that the Commissioner's decision should not be disturbed.

## Analysis

The Court has observed that "[i]n reviewing the decisions of a regulatory agency, the agency's findings of fact are conclusive if supported by substantial evidence." *Country Vintner, Inc. v. Rosemount Estates, Inc.*, 35 Va. App. 56, 62 (2001). The Court further observed that "the issue of whether ... [there is] ... 'good cause' to terminate a franchise agreement ... [presents] a mixed

question of fact and law. . . ." *Id.* at 63. The constitutional issues raised by MMCA may properly be reviewed by the court. Because the issue of "good cause" presents questions of fact and law, the former shall be reviewed under the substantial evidence test and the latter by the court *de novo*.

The statute requires the Commissioner to consider factors on the franchisee's business investment, adequacy of facilities, equipment, personnel, effect on the community, dealer services on warranties, and other economic and geographical factors. In failing to find good cause, MMBA contends, the Commissioner either failed to account for relevant evidence or did not require additional evidence on which good cause would be shown. For example, MMBA argues that the Commissioner did not properly interpret and apply Va. Code §§ 46.2-1500, 46.2-1569(5), and 46.2-1573(D)(1) in determining lack of good cause based on the volume of WBM's business in the relevant market area. Further, MMBA claims that the Commissioner should have focused on the business in WBM's "relevant market area" as defined in Va. Code § 46.2-1500 and not on WBM's total business. MMSA also maintains that the Commissioner's decision should be overturned because he weighed all factors equally, not giving sufficient weight to his finding that WBM breached its contract by not obtaining advance approval.

On an administrative agency's findings of fact, the issue of good cause in franchise termination is reviewed on the evidence before the agency that could support the outcome. The court finds that the Commissioner's decision adequately considers each of the statutory factors contained in Va. Code § 46.2-1573(D) on the facts of record. Under Point 9 of his written decision, the Commissioner explicitly discusses and weighs all eight of the required factors considering the evidentiary facts adduced at the hearing. The court finds that the Commissioner did not err in finding that the statutory factors weigh against good cause, even considering that WBM breached the agreement. The General Assembly's directive to the Commissioner is to determine good cause by considering the listed factors. The breach may relate to one or more of those factors and to the extent they may not, the analysis must continue by consideration of the other factors, all toward determining whether good cause does or does not exist.

The Commissioner found that WBM had a substantial volume of business in the relevant market area, as weighed under the first statutory factor. This finding is supported by evidence in the record that WBM had sales of approximately $88,000,000 between 1992 and 1999. Additionally, the record supports that Mr. Page, WBM's primary stockholder and executive officer, invested approximately $1,000,000 in WBM, never collecting a salary. This evidence supports the fact that the Commissioner found that the second

statutory factor on the nature and extent of the dealer's investment in the business weighed in favor of WBM. Factor three looks to the adequacy of the dealer's services facilities and equipment. The record reflects that the dealer's facilities and equipment were adequate because the department and offices were always fully equipped with the necessary machinery. Additionally, the evidence supported the weighing of statutory factor four in favor of WBM because MMSA testified that it would take at least months before a new dealer could replace WBM and did not provide any evidence that a replacement could occur even this quickly. This factor concerns the effect of the termination on the community. Therefore, the Commissioner could find that the community would be inconvenienced by the termination of WBM's dealership, as the next dealership is fifteen miles away.

As to statutory factor six, dealing with the dealer's performance under the franchise, the Commissioner reasonably found that WBM performed well under the terms of its franchise based upon the evidence that MMSA had given awards to WBM, WBM did well on MMSA's Contact Reports, and WBM'S Sales Satisfaction Index scores were high. This is the only factor that the Commissioner found which may weigh against WBM, based upon the finding that WBM breached the agreement and failed to fully cooperate with MMSA. In view of the statutory factors, the Commissioners findings are based on facts; evidence is in place that supports the Commissioner's consideration of the factors as weighing in WBM's favor.

The thrust of MMSA's appeal is that the Commissioner's finding that WBM breached the parties' agreement should overwhelm all other findings on the factors. The court is not required to give deference to an agency in the area of contract interpretation. However, upon examination of the contract documents, the court finds that the Commissioner was correct in that there is no requirement of exclusivity, but there was a breach of obligation to obtain prior written approval before the introduction of another product line. For the reasons discussed, the analysis does not stop on merely finding a breach.

The documents pertinent to the issue of exclusivity are the Dealer Franchise Agreement, the Dealer Sales and Service Agreement, and the Dealer Development Plan. MMSA terminated WBM for failing to maintain all requirements and conditions of the Dealer Franchise Agreement including the requirements for exclusive facility, management, and capital requirements found in the Dealer Development Plan. MMSA and WBM entered into the Dealer Sales and Service Agreement on October 15, 1992. By its terms, this agreement terminated and superceded "all prior written agreements" between the parties. This agreement incorporates by reference the Dealer Sales and Service Agreement Standard Provisions and the Dealer Development Plan.

Section Six of the Dealer Agreement states: "Dealer shall maintain all requirements and conditions of this MMSA Dealer Sales and Service Agreement as outlined in Dealer's most recent Dealer Development Plan, including but not limited to exclusive facility, management, and capital requirements." Accordingly, it is necessary to examine the Dealer Development Plan on the question of exclusivity.

The Dealer Development Plan lists a number of "requirements" in the following areas: (1) General Financing, (2) Personnel, (3) Dealership Facility, (4) Minimum Capitalization, (5) Minimum Dealership Facility. The language in this document evidences that WMB agreed, and thereby obligated itself, to meet the requirements in these areas. The Dealer Development Plan further provides: "Dealer hereby acknowledges that he has read and fully understands the foregoing recommendations and listed deficiencies and agrees to make every effort to meet such recommendations and correct such deficiencies within the time periods indicated."

This language follows Section 4, titled "Planning Potential," which states: "The estimated planning potential for this point is 451 units. MMSA has the following recommendations regarding Dealer's sales: Separate and exclusive permanent sales ... complies with all MMSA guidelines including exclusive sales people and personnel for MMSA and the installation of the Marketing Architectural Program." There is no binding language regarding exclusivity. Therefore, §§ 4-6, 8 of the Dealer Development Plan did not require that WBM maintain exclusive facilities for Mitsubishi vehicles. Similarly, in the Sales and Service Agreement Standard Provisions, there is no language mandating that WBM maintain exclusive facilities for MMSA.

MMSA further asserts that the Commissioner erred in failing to find that the parties agreed that WBM would make every effort to meet the exclusivity. In *Country Vintner*, the dispute was between a wine distributor and a manufacturer over the manufacturer's decision to terminate a wine distribution franchise agreement. Under Virginia Code § 4.1-406, a reasonable requirement on a distributor with which the distributor failed to comply is grounds for termination. No such factor is listed in the statutes applicable here. In *Country Vintner*, the Court found that the franchise agreement imposed a requirement that the distributor use its best efforts to sell wine products in Virginia. Here, WBM only agreed to make every effort to meet a recommendation. Therefore, *Country Vintner* is distinguished from this case and does not bind the court.

Finally, the Commissioner was correct in determining that parol evidence of the actions and understandings of the parties prior to the 1992 contract was inadmissible because, as noted, the October 1982 agreement, by its terms,

"terminates and supercedes all prior written or oral agreements and understandings."

Next, the court considers the constitutional issues. First, WBM and the Commissioner claim that MMSA failed to raise the issue of constitutionality during the administrative process. In *Phillips v. Telum, Inc.*, 223 Va. 585 (1982), the Court held that issues without remedy during the appeal process may be raised *de novo* during the appeal process. *Id.* at 588. For the reasons discussed, neither the hearing officer nor the Commissioner have the authority to decide the constitutionality of the Virginia statutory scheme for adjudicating motor vehicle franchise termination disputes. That jurisdiction rests with the court. Thus, MMSA has properly raised the issue of constitutionality.

Second, there are guiding principles that apply in considering claims of statutory unconstitutionality. Upon considering MMSA's due process claims, a presumption of constitutionality applies. This is especially the case when the claimant, as here, asks the court to strike down a statute as unconstitutional. The Court has stated that " '[e]very law enacted by the General Assembly carries a strong presumption of validity. Unless a statute clearly violates a provision of the United States and Virginia Constitutions, we will not invalidate it.' [citations omitted] 'The burden is on the challenger to prove the alleged constitutional defect.' [citations omitted]" *Quillian* at 51. The court need not give deference to an agency's decision on legal issues because these fall outside the agency's field of expertise. Issues such as constitutionality of a statute and violation of due process rights fall outside the expertise of an agency. *Id.* at 50. Claims of due process violation have both procedural and substantive aspects.

The Fourteenth Amendment to the United States Constitution gives every individual his or her right to due process of the law before he or she is deprived of their "life, liberty, or property." Only those property rights protected under the Constitution, however, are protected by this provision. *Gilbert v. Homar*, 520 U.S. 924 (1997). Procedural due process protection depends upon the surrounding circumstances. *Id.*; *Mallette v. Arlington County Employees' Supplemental Retirement Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996). In determining the extent of procedural due process to be afforded a property right, the court considers three factors: (1) the interest of the party claiming the protection, (2) the adequacy of the current procedure to protect the right, and (3) the cost to conduct this procedure as weighed against the government's interest in protecting the right. *Gilbert* at 931-32.

MMSA claims that having an exclusive franchise agreement is a property right protected under the Constitution. A franchise agreement is a contract between at least two parties. A property right based on a contract is protected

under the Constitution provided there is a mutually explicit understanding between the parties as to that property right. *Mallette* at 637. Without such an understanding between the parties, there is no property right protected by due process.

"A written contract with an explicit provision clearly is evidence of a formal understanding ... support[ing] a ... claim of entitlement. . . ." *Perry v. Sinderman*, 408 U.S. 593 (1972). In this case, exclusivity is an issue contested by both parties and there is no explicit provision regarding exclusivity. Thus, claims based on such a franchise contract are not property rights that are entitled to procedural due process protection. Even if, for the sake of argument, any exclusivity requirement in the franchise agreement is deemed to be a protected right, the court must only consider whether the claimant received notice and an opportunity to be heard. *Mallette* at 640; *McKesson Corp. v. Div. of Alcoholic Beverage and Tobacco*, 496 U.S. 18, 37 (1990). MMSA appeared before the hearing officer, and it, DMV, and WBM presented evidence and arguments on the issues. Therefore, MMSA had both notice and an opportunity to be heard. MMSA additionally had the opportunity to appeal the decision, as it has done. The statute affords MMSA with procedures to protect its rights in the franchise without depriving it of its procedural due process rights.

As to substantive due process, the level of scrutiny to be applied to determine an unconstitutional deprivation depends upon the right affected by the state's action. If a state regulation infringes on the fundamental right of a person, it must be done in the least restrictive manner to further the state's compelling interest. *Washington v. Blucksberg*, 521 U.S. 702, 720-21 (1997). The right to marriage and family life are afforded such protection. *Id.*; *see also Phyler v. Moore*, 100 F.3d 365 (4th Cir. 1996). When all other non-fundamental rights are implicated, the court applies the rational basis test. Here, the court must only determine whether the law reasonably advances the state's objectives as provided by the statute. The court must generally accept the state's reasoning for the law. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973). If the court finds that the state regulation is not arbitrary and capricious and is related to the state's purported objectives, there is no substantive due process violation. *Slochower v. Board of Higher Education*, 350 U.S. 551 (1956).

The burden of proof is on MMSA to show that the law is not rationally related to a legitimate government interest. This burden is difficult to sustain. The state has two legitimate interests promoted by the statutory framework on dealer-manufacturer disputes. Firstly, the state has an interest in streamlining those claims brought before its agencies. Toward that end it has prescribed a

set of factors to be considered by an administrative agency in resolving claims of franchise termination. Secondly, given the disparity in the bargaining power between the manufacturer and dealers, the state's franchise regulations governing this relationship support the interests of consumers. *New Motor Vehicle Bd. v. Orrin W. Fox, Co.*, 439 U.S. 96, 101-02 (1978). These interests are legitimate because they promote efficiency and protect the citizenry of the state. The statutes herein are rationally related to achieving these legitimate state interests. This includes the General Assembly's choice in enacting a statute constituting a Dealer Board with the Commissioner of the DMV as it Chairman. For these reasons, the statute does not violate MMSA's substantive due process rights.

Nor is there any basis in law to conclude that, throughout the process, MMSA has been confronted with what counsel referred to as an "unconstitutional two-headed Hydra" in the form of the Commissioner's capacities as head of the Motor Vehicle Dealer Board and adjudicator of automobile dealer-manufacturer franchise termination disputes, as required by Virginia law. In *Withrow v. Larkin*, 421 U.S. 35 (1975), the Court held that in order to prove that the investigative and judicial functions vested in one position create an unconstitutional bias, the petitioner must overcome the presumption that officials performing such duties are honest. *Id.* at 47. In *Litely v. United States*, 510 U.S. 540 (1994), the Court explained that an adjudicator's predisposition can be characterized as "bias" or "prejudice" if the favoritism is "wrongful or inappropriate." *Id.* at 5511-12. In *Tug Valley Recovery Ctr. v. Watt*, 703 F.2d 796 (4th Cir. 1983), the court stated that "[t]here is no due process right to have one's claims heard before a court purged of ideology." *Id.* at 801. Quoting K. Davis, *Administrative Law Treatise*, §§ 19.1-19.6 (2d ed. 1978), the *Tug Valley* court continued: "[a] prejudgment or point of view about a question of law or policy, even if so tenaciously held as to suggest a closed mind, is not, without more, a disqualification. .... A personal bias or personal prejudice, that is, an attitude toward a person, as distinguished from an attitude about an issue, is a disqualification when it is strong enough. . . ." *Id.* at 802, n. 10. MMSA must overcome the presumption that the Commissioner made an honest and fair decision. MMSA must shoulder the burden to demonstrate that the Commissioner's analysis of the issues resulted in a wrongful and partisan outcome.

MMSA alleges that the Commissioner has a direct pecuniary interest because he must safeguard the best interests of the Dealer Board. The Supreme Court has ruled that no conflict of interest exists unless the adjudicator has a direct pecuniary interest in the outcome that would tempt

him or her to disregard the burden of proof. No such pecuniary interest exists in this case. In *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), the Court stated that the joint presence of executive and judicial functions in one position does not automatically violate due process. In *Ward*, the mayor was responsible for the finances and law enforcement of the village. The financial revenue generated from the law enforcement activities formed a significant portion of the total village revenues. *Id.* at 58. The test employed by the Court was whether the circumstances could possibly tempt the adjudicator to be biased in his decision-making. *Id.* at 60. In *Tumey v. Ohio*, 273 U.S. 510 (1927), the Court held that a person's due process rights are, however, violated if the adjudicator has a pecuniary interest in the outcome of the trial because such an interest could tempt the adjudicator to be biased in his decision. *Id.* at 523. In *Tumey*, the city paid the mayor fees and costs if the mayor convicted the defendant and imposed a fine. This kind of pecuniary interest is such that it tempts the adjudicator not to consider the necessary burden of proof for a conviction. *Id.* at 533-34. Accordingly, in *Dugan v. Ohio*, 277 U.S. 61 (1928), the relationship did not favor a presumption of bias and an unfair trial because the mayor's salary was fixed, not dependant upon the decisions he made in a judicial capacity. *Id.* at 64.

Pecuniary is defined as "[m]onetary; relating to money; financial; consisting of money or that which can be valued as money." *Black's Law Dictionary* 782 (Abridged 6th ed. 1991). In all the cases above, the benefits were monetary. Here, the Commissioner derives his salary from funds allotted to DMV by the General Assembly. DMV funds do not support the Dealer Board. The Commissioner does not receive any monetary benefit from the Dealer Board. Therefore, the Commissioner does not have a pecuniary interest in the Dealer Board that would tempt him to not consider the appropriate burden of proof in deciding dealer-manufacturer disputes and violate the Fourteenth Amendment.

MMSA claims that the Commissioner's conversations with Dealer Board members during the Dealer Board meetings, are *ex parte* communications depriving MMSA of a fair trial because there was some mention of the case. In *North Carolina v. Environmental Protection Agency*, 881 F.2d 1250 (4th Cir. 1989), the dispositive question was whether the taint of *ex parte* communication can be overcome by the procedures of a hearing to ensure a fair trial. There, an Administrative Law Judge was appointed to conduct a hearing and render an interim decision. The EPA Administrator then rendered the final decision based on the record. *Id.* at 1253. The petitioners alleged that EPA officials had *ex parte* communications regarding the proceedings with parties interested in the matter. *Id.* at 1253-54. The court held that, where the

Administrative Law Judge gave adequate assurances that the parties could address and rebut the information within such a communication, informally or in a hearing, the procedures utilized were such to overcome any taint caused by the communication. *Id.* at 1258.

MMSA's claims that the evidence of the Board meetings shows that the social interactions between the dealers and the Commissioner and an update about this case to the Board by its attorney are *ex parte* communications. However, generally speaking, the evidence of each Board committee meeting shows the Commissioner specifically addressed the subject matter of each meeting with the interested parties during his attendance. And, as to this case, the parties followed the statutory scheme governing franchise termination. Findings of fact and a decision on them were first made by a hearing officer following a hearing, at which time, MMSA had an opportunity to present evidence and to be heard. Following the same scheme, appeals have been made to the Commissioner and to this court. Any taint brought about by *ex parte* communication has been overcome by the applicable procedures. For the reasons mentioned, no bias has been shown on the part of the Commissioner that deprived MMSA of a fair hearing.

The court finds that MMSA has failed to carry its burden of showing that the statutory framework requiring the Commissioner to decide dealer-manufacturer franchise disputes is unconstitutional.

For the reasons stated here, the court denies MMSA's appeal.

Counsel for the Commissioner and WBM are directed to provide a final order denying MMSA's appeal and affirming the Commissioner's decision, with MMSA's exceptions noted.